IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND RESTORATIVE JUSTICE
INITIATIVE *et al.*,
          *Plaintiffs*,

          *v.*

GOVERNOR LARRY HOGAN *et al.*,
          *Defendants*.

Civil Action No. ELH-16-1021

## MEMORANDUM OPINION

Plaintiffs Calvin McNeill, Nathaniel Foster, and Kenneth Tucker (collectively, the "Named Plaintiffs"), along with the Maryland Restorative Justice Initiative ("MRJI"), filed a 61-page complaint, challenging the constitutionality of Maryland's parole system as applied to individuals who received sentences of life imprisonment, with parole, for homicide offenses they committed as juveniles ("Juvenile Offender" or "Juvenile Offenders"). ECF 1 ("Complaint"). MRJI, "a grassroots membership organization dedicated to prisoners' rights," has sued on "behalf of its members" (ECF 1, ¶¶ 13, 16), "including more than 100 juvenile lifers and their families…" *Id.*, ¶ 119.[1]

The defendants are four Maryland officials who have been sued in their official capacities: Governor Larry Hogan; David Blumberg, Chair of the Maryland Parole Commission ("MPC"); Stephen Moyer, Secretary of the Maryland Department of Public Safety and

---

[1] The Complaint states that in Maryland there are "more than 200 individuals" serving life sentences for offenses committed as juveniles. ECF 1 ¶ 8. Plaintiffs assert that "most" of the "more than 200 parole-eligible juvenile lifers in Maryland" are members of MRJI. ECF 35 at 8.

Correctional Services ("DPSCS"); and Dayena M. Corcoran, Commissioner of the Maryland Division of Correction ("DOC")[2] (collectively, the "State").

The Complaint contains three counts: "Violation of the Eighth Amendment Prohibition Against Cruel and Unusual Punishment and 42 U.S.C. § 1983 (Count One); "Violation of Article 25, Md. Decl. of Rights Prohibition Against Cruel or Unusual Punishment" (Count Two); and "For Declaratory Judgment that Maryland Code, Criminal Law Article § 2-201(b) Is Unconstitutional" (Count 3).  ECF 1.[3]

Plaintiffs assert that they "have been and continue to be denied a meaningful opportunity for release," in violation of the Eighth Amendment to the Constitution and Article 25 of the Maryland Declaration of Rights.  ECF 1, ¶ 1.  They claim that although Maryland ostensibly provides parole eligibility for Juvenile Offenders serving life sentences, in practice under the Maryland parole system such sentences are converted into unconstitutional "de facto" sentences of life without parole.  *Id.*, ¶¶ 11-12, 167-185.  According to plaintiffs, "of more than 200 parole-eligible juvenile lifers in Maryland," "*no one* has been paroled in the last twenty years."  ECF 35 at 8 (emphasis in original); *see* ECF 1, ¶¶ 58; 64; 74; 117, 119.  In support of their claim of unconstitutionality, plaintiffs rely on several decisions of the Supreme Court, including *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Miller v. Alabama*, 567 U.S.___, 132 S. Ct. 2455, 2469 (2012); and *Montgomery v. Louisiana*, ___U.S.___, 136 S. Ct. 718, 734 (2016).

Further, plaintiffs seek a declaration that two provisions of Maryland law are unconstitutional: Md. Code (2008 Repl. Vol.), § 7-301(d)(4) of the Correctional Services ("C.S.") Article and Md. Code (2012 Repl. Vol.), § 2-201(b) of the Criminal Law Article

---

[2]  Plaintiffs initially sued Wayne Webb, former Commissioner of DOC.  ECF 1. However, Corcoran is the current Commissioner of DOC and has been substituted as a defendant.  *See* ECF 13.

[3]  Plaintiffs denominate their counts with both words and a number.

("C.L."). According to plaintiffs, C.L. § 2-201(b) is unconstitutional because "it mandates judges to impose life sentences without adequate consideration of youth status . . . resulting in grossly disproportionate punishment…" ECF 1, ¶ 15. And, they argue that C.S. § 7-301(d)(4) is unconstitutional as applied to Juvenile Offenders because the Governor is not required to follow or consider parole recommendations made by the MPC (*id.* ¶ 72), nor is he guided by any factors or standards, either statutory or regulatory, in granting or denying parole. *Id.* ¶ 73.

In addition, plaintiffs challenge the policies and practices implemented by the MPC. *See id*, ¶¶ 81-90. In particular, plaintiffs maintain that the risk assessment tools used by the MPC to assess individuals "penalize those who were young at the time of offense…" by "assessing them as they were when they were most risky…" ECF 1 ¶¶ 61, 87 (alterations added). Plaintiffs also claim that the automatic classification of all Juvenile Offenders to maximum security upon commitment to DOC, and the categorical bar for lifers on progressing below medium security, denies Juvenile Offenders opportunities to advance through the DOC system to demonstrate their maturity and rehabilitation, "[b]ecause virtually every aspect of programming is determined by an individual's classification level." *Id.* ¶ 99; *see also id.*, ¶ 62. Plaintiffs also argue that "juveniles are severely limited in their ability to demonstrate rehabilitation through the gradual earning of additional privileges and the ability to succeed in lower-security settings." *Id.*, ¶ 99.

Pursuant to Fed. R. Civ. P. 8(c), 12(b)(1), and 12(b)(6), defendants have filed a motion to dismiss, or in the alternative, for summary judgment (ECF 23), supported by a memorandum (ECF 23-1) (collectively, "Motion" or "Motion to Dismiss"), and several exhibits. ECF 23-3 to ECF 23-5. Plaintiffs oppose the Motion (ECF 35, "Opposition") and have submitted a Rule 56(d) declaration from one of their lawyers, asserting a need for discovery. On that basis, they oppose conversion to summary judgment. ECF 35-1. Defendants replied (ECF 41, "Reply"),

supported by an affidavit. ECF 41-1.  Plaintiffs moved to file a surreply (ECF 43), which I granted by Order of January 3, 2017 (ECF 59).

In an Order of August 30, 2016 (ECF 33), Roberta Roper, Deborah Kempl, Jessica Fisher, Patti Krogmann, and the Maryland Crime Victims' Resource Center, Inc. (collectively, "Amici") were granted amicus curiae status in the case.  *Id.*[4]  They submitted a memorandum in support of the Motion to Dismiss (ECF 34), supported by three documents previously filed with the court and refiled as ECF 34-1 to ECF 34-3.  Plaintiffs have moved to strike the amici submission (ECF 36), supported by a memorandum (ECF 36-1) (collectively, "Motion to Strike").  Amici have responded (ECF 40) and plaintiffs have replied.  ECF 42.

By Order of December 7, 2016 (ECF 48), I directed counsel to submit supplemental memoranda addressing *LeBlanc v. Mathena*, 841 F.3d 256, 261 (4th Cir. 2016), a decision of the United States Court of Appeals for the Fourth Circuit issued on November 7, 2016, in regard to a habeas case.[5]  The parties submitted the requested memoranda on December 16, 2016.  *See* ECF 49 (plaintiffs); ECF 50 (defendants).  They submitted responses to the supplemental memoranda on December 28, 2016.  *See* ECF 57 (plaintiffs); ECF 58 (defendants).

On January 4, 2017, the Court held a motions hearing at which oral argument was presented.  *See* ECF 47; ECF 61.

For the reasons that follow, I shall deny the Motion to Strike.  And, I shall grant in part and deny in part the Motion to Dismiss.

---

[4] I denied the motion to intervene filed by Amici.  *See* ECF 9 (Motion); ECF 33 (Order of August 30, 2016).

[5] A petition for rehearing was denied on January 20, 2017.

# I.    Factual Background[6]

The Named Plaintiffs are adult inmates in Maryland correctional institutions.  They are all serving sentences of life imprisonment, with parole,[7] for homicides that they committed when they were juveniles, *i.e.*, under the age of eighteen.  ECF 1, ¶¶ 1, 13, 122, 136, 147.[8]

Calvin McNeill "was sentenced to life with parole under Maryland's mandatory sentencing scheme for felony murder" (ECF 1, ¶ 122) for "his role in a fatal robbery of a dice game [sic] that occurred in 1981, the day he turned 17 years old."  *Id.* ¶ 120.  When this suit was filed in April 2016, McNeill was 51 years of age and had spent more than 35 years in prison for this offense.  *Id.* ¶ 121.  He has earned "an exceptional institutional record in the DOC" (*id.* ¶ 124), has "taken advantage of every program available to him, earned positions of trust in employment, and taken leadership roles in programs to promote alternatives to violence within and outside DOC."  *Id.* ¶ 124.  McNeill was recommended for "commutation" in 2008, "[i]n recognition of this strong record . . . ."  *Id.* ¶ 125.  In 2011, "Governor O'Malley rejected this recommendation without explanation."  *Id.* ¶ 126.  McNeill's sixth parole hearing was scheduled for 2015 (*id.* ¶ 127) and, during that hearing, parole commissioners "told him they would be

---

[6] The factual allegations are derived from the Complaint. ECF 1. Based on the procedural posture of the case, I shall assume the truth of these factual allegations. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

[7] To be clear, the Complaint states that the Named Plaintiffs were sentenced to "life in prison" (ECF 1, ¶¶ 122, 137) or "life imprisonment." *Id.* ¶ 147.  According to the Complaint, only McNeill and Tucker were expressly sentenced to life with parole. *Id.* ¶¶ 120, 136.

[8] In Maryland, a sentencing judge has discretion to suspend all or part of a parolable life sentence. *Cathcart v. State*, 397 Md. 320, 328, 916 A.2d 1008, 1013 (2007) (requiring imposition of period of probation upon suspension of execution of all or part of a life sentence); *State v. Wooten*, 277 Md. 114, 115, 352 A.2d 829, 839 (1976) (finding "nothing improper in the trial court's suspension of all but the first eight years of the life sentence it imposed in this case"). However, the life sentences of the Named Plaintiffs were not suspended in any respect.

recommending him for a risk assessment." *Id.* ¶ 128.  As of the date of filing of the Complaint, the assessment had not occurred.  *Id.*

In 1974, when Kenneth Tucker was seventeen years of age, he was sentenced to life with parole "under Maryland's mandatory sentencing scheme . . . for participating in a robbery-murder with another teenager." *Id.* ¶ 136.  According to plaintiffs, "Mr. Tucker's co-defendant killed the victim." *Id.*  But, "[b]ecause the case involved a homicide that occurred during the course of a robbery, Mr. Tucker was charged with felony murder and faced a mandatory penalty of life in prison." *Id.* ¶ 137.  At the time suit was filed, Tucker was 59 years of age and had been incarcerated for 42 years.  *Id.* ¶ 136.

Tucker allegedly "began turning his life around almost immediately upon his incarceration, earning his high school equivalency in 1975, an associate's degree in 1989, and a bachelor's degree in psychology in 1994." *Id.* ¶ 139.  Tucker has "obtained certification or training in several professions" and "is currently an observation aide in the prison hospital, where he provides consolation and coping strategies to terminally ill and mentally distressed peers." *Id.*  Tucker also belongs to the prison's "Scholars program" and serves as a volunteer mentor.  *Id.*  Plaintiffs aver that as early as 1987, "case management recommended [Tucker's] transfer to preferred trailer housing and medium security because of his good institutional adjustment and infraction-free record . . . ." *Id.* ¶ 140.

According to plaintiffs, "Mr. Tucker declined his parole hearing in 1996, believing the process was futile. He did not have any parole hearing again for nearly 20 years…as he did not see much point to reinstating hearings when no lifers were being paroled." *Id.* ¶ 142. Tucker had his sixth parole hearing in 2014.  *Id.* ¶ 143.  "Commissioners who heard his case recommended that he progress to the next step, which is the risk assessment . . . ." *Id.*  However, "[a]fter the

evaluation was completed, the parole commission denied parole and set his next hearing for 2017." *Id.*

In 1983, "Nathaniel Foster was involved in a botched robbery attempt along with his co-defendant," during which "the victim was killed." *Id.* ¶ 146. He was seventeen years old at the time. *Id.* Because Foster's case "involved a homicide that occurred during a robbery, Mr. Foster was charged with first-degree murder and subjected to a mandatory penalty of life imprisonment . . . ." *Id.* ¶ 147. When this lawsuit was filed, Foster had been incarcerated for 32 years. *Id.* ¶ 149.

While incarcerated, Foster has maintained "an exemplary institutional record" with "only two minor infractions in the last three decades" and no "infraction of any kind in the last 16 years . . . ." *Id.* ¶ 150. Foster has also "pursued his education" and has "held a number of jobs while incarcerated including working in the canteen and cooking for the Officer's Dining Room." *Id.* ¶ 152. Foster "has been entrusted with extraordinary responsibilities in these jobs" (*id.*), and has also "served as a volunteer helping to care for men who are gravely and terminally ill at the prison hospital." *Id.* ¶ 153.

According to plaintiffs, Foster has had numerous parole hearings in the last twenty years, including in 1995, 2000, 2005, 2008, 2011, and 2013. *Id.* ¶ 155; *see also id.* ¶¶ 156-165. During the 2013 hearing, the MPC noted: "Offender presented well, has excellent job evaluations and mentors younger prisoners. After considering all factors, a rehear for 1/2015 is suitable given nature & circumstances of offense." *Id.* ¶ 164 (internal quotations omitted). However, "[a]t the beginning of 2015, disheartened by his sense of futility in the parole process as he was repeatedly recognized for having an excellent record but then denied release due to the offense itself, without regard for his juvenile status, Mr. Foster declined a parole hearing." *Id.* ¶ 165.

Thereafter, during a 2016 parole hearing, Foster was "advised that he will be sent to Patuxent for a psychological evaluation." *Id.*

Plaintiffs explain that "Maryland's parole system changed dramatically in 1995, when then-Governor Parris Glendening took office and announced that he was unwilling to grant parole to individuals serving life sentences…" *Id.*, ¶ 105.  They observe that from 1995 to 2015, a period of two decades, Governors Glendening, Ehrlich, and O'Malley received recommendations for parole for 24 individuals serving life sentences, both juveniles and adults, and rejected every one, without explanation. *Id.* ¶ 116.  *See id.* ¶ 117.  In contrast, between 1969 and 1994, "181 lifers were paroled" by Governors Mandel, Hughes, and Schaefer.  ECF 1, ¶ 118.

## II.     Maryland's System for Prisoner Release

### A.  Maryland Parole Commission

In general, parole is a discretionary system of conditional release administered by the MPC.  *See* C.S. § 7-101(i). Many inmates are eligible for parole after serving one-quarter of their sentences.  C.S. § 7-301(a). However, inmates serving sentences for violent crimes, as defined in C.S. § 7-101(m), must serve half of their sentences before they are eligible for parole.  C.S. § 7-301(c).

According to the State, "[t]he law governing parole eligibility for inmates serving parolable life sentences typically entitles them to *earlier* parole consideration than that available to inmates serving a term of years for a violent crime."  ECF 23-1 at 15 (emphasis in original). Defendants explain that an inmate serving a life sentence ordinarily is eligible for parole after serving fifteen years of the sentence, less diminution credits.  C.S. § 7-301(d)(1).  However, if the case is one in which the prosecutor sought a sentence of death or life without the possibility

of parole, under former C.L. § 2-303 or C.L. § 2-304, the inmate is not eligible for parole until after he or she serves twenty-five years, less diminution credits.  C.S. § 7-301(d)(2).[9]

In all cases, the applicable statute and regulations require the MPC to consider several factors in determining whether to grant parole, including, for example, the circumstances of the crime and the inmate's progress during confinement.  C.S. § 7-305; *see also* Maryland Code of Administrative Regulations ("COMAR") § 12.08.01.18 (1995) (listing criteria to be considered).

Notably, after this suit was filed, the MPC enacted new regulations requiring it to consider certain factors in determining whether a prisoner who committed a crime as a juvenile is suitable for release on parole.  *See* COMAR 12.08.01.18.A(3) (amended October 24, 2016).[10] These factors are as follows, *id.*:

(a) Age at the time the crime was committed;

(b) The individual's level of maturity and sense of responsibility at the time of the crime was [sic] committed;

(c) Whether influence or pressure from other individuals contributed to the commission of the crime;

(d) Whether the prisoner's character developed since the time of the crime in a manner that indicates the prisoner will comply with the conditions of release;

(e) The home environment and family relationships at the time the crime was committed;

---

[9] An inmate serving a parolable life sentence cannot be released through the application of diminution credits, but application of credits will result in parole eligibility after approximately eleven and a half years, or approximately twenty years if a sentence of death or life without the possibility of parole was initially sought but not imposed.

[10] The MPC has been delegated legislative authority to "adopt regulations governing its policies and activities . . ." C.S. § 7-207(a)(1). Thus, its regulations have the force of law. *See State v. Roshchin*, 446 Md. 128, 148 n.20, 130 A.3d 453, 455 n.20 (2016) (explaining that legislative regulations "receive statutory force upon going into effect")); *Building Materials Corp. of Am. v. Board of Educ. of Baltimore County*, 428 Md. 572, 591 n.25, 53 A.3d 347, 358, n. 25 (2012) ("Legislative regulations result from a specific statutory grant, and are treated and enforced as binding law.").

(f) The individual's educational background and achievement at the time the crime was committed; and

(g) Other factors or circumstances unique to prisoners who committed crimes at the time the individual was a juvenile that the Commissioner determines to be relevant.

The DOC also recently revised its policies regarding prisoners serving life sentences for crimes committed as juveniles. The Division's Case Management Manual now allows such an inmate to be classified to minimum or pre-release security if the MPC recommends that the inmate participate in "outside testing and/or work release." ECF 23-4 (Executive Directive OPS.100.0004.5.D.).

## B.  Role of the Governor

Maryland's Governor has a significant role in regard to parole for anyone serving a life sentence.  Under C.S. § 7-301(d)(4), the Governor must approve a decision of the MPC to grant parole to an inmate who has served fewer than twenty-five years of a life sentence, without application of diminution credits.  C.S. § 7-301(d)(4) states:  "Subject to paragraph (5) of this subsection, if eligible for parole under this subsection, an inmate serving a term of life imprisonment may only be paroled with the approval of the Governor."  Pursuant to C.S. § 7-301(d)(5), such approval is not required if the Parole Commission elects to parole an inmate who has served twenty-five years or more of a life sentence.  However, even in that circumstance, the Governor "may disapprove the decision" of the MPC with regard to such an inmate.  C.S. § 7-301(d)(5)(ii).[11]   Since 2011, if the MPC elects to parole an inmate who has served at least

---

[11] C.S. § 7-301(d)(5) states:

> (5)(i) If the Commission decides to grant parole to an inmate sentenced to life imprisonment who has served 25 years without application of

twenty-five years, and the Governor does not disapprove the MPC's decision within 180 days of receiving notice of it, the parole decision "becomes effective." C.S. § 7-301(d)(5)(iii).[12]

Notably, there are currently no statutory or regulatory provisions that govern the Governor's exercise of his discretion.

However, on February 2, 2017, Delegate Pamela Queen and eleven co-sponsors introduced in the Maryland House of Delegates House Bill 723, "Inmates – Life Imprisonment – Parole Reform." The bill proposes to amend C.S. § 7-301 by repealing subsections d(4) and d(5) in their entirety. Under the terms of the proposed bill, the Governor would no longer have a role in approving or disapproving decisions of the MPC as to parole for individuals serving life sentences. *See* H.B. 723 at 3 (2017 Regular Session).[13]

The proposed bill sets forth its purposes. It states, in relevant part, *id.* at 1:

> FOR the purpose of repealing certain provisions that provide that inmates serving a term
>
>> of life imprisonment may be paroled only with the Governor's approval, subject to certain provisions; repealing certain provisions that require certain parole decisions to be transmitted to the Governor under certain circumstances; repealing certain provisions that authorize the Governor to disapprove certain parole decisions in a certain manner; repealing certain provisions that provide that if the Governor does not disapprove a certain parole decision in a certain manner within a certain time period, the

---

>> diminution of confinement credits, the decision shall be transmitted to the Governor.
>>
>> (ii) The Governor may disapprove the decision by written transmittal to the Commission.
>>
>> (iii) If the Governor does not disapprove the decision within 180 days after receipt, the decision becomes effective.

[12] According to the State, these laws also apply to inmates serving sentences of life with a portion of the sentence having been suspended. ECF 23-1 at 18.

[13] A hearing is scheduled before the House Judiciary Committee on February 14, 2017, as to House Bill 723.

- 11 -

decision becomes effective; making stylistic changes; making a technical correction; and generally relating to sentences of life imprisonment.

And, on February 3, 2017, Senator Nathaniel McFadden and six co-sponsors introduced in the Senate of Maryland Senate Bill 694, "Inmates – Life Imprisonment – Parole Reform." As of this writing, I am unable to obtain the contents of this proposed bill. But, it was cross-filed with House Bill 723.

I cannot predict whether these Bills will pass. But, two prior attempts, in 2015 and in 2016, were unsuccessful. *See* SB 531 (2016 Regular Session); SB 111 (2015 Regular Session); HB 882 (2016 Regular Session); HB 303 (2015 Regular Session). In any event, I must analyze the issues raised by plaintiffs' Complaint under the existing Maryland statutory and regulatory framework.

## C. Executive Clemency

The Supreme Court explained the difference between parole and clemency in *Solem v. Helm*, 463 U.S. 277 (1983). There, it said, *id.*at 300-01:

> As a matter of law, parole and commutation are different concepts, despite some surface similarities. Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases. The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time….Thus it is possible to predict, at least to some extent, when parole might be granted. Commutation, on the other hand, is an *ad hoc* exercise of executive clemency. A Governor may commute a sentence at any time for any reason without reference to any standards.

In Maryland, "'Commutation of sentence' means an act of clemency in which the Governor, by order, substitutes a lesser penalty for the grantee's offense for the penalty imposed by the court in which the grantee was convicted." C.S. § 7-101(d). Maryland's Governor has the power to grant commutations and pardons, which is derived from Article II, § 20 of the Maryland Constitution. The Governor's authority is codified at C.S. § 7-601, which permits the

Governor, as relevant here, to "pardon an individual convicted of a crime subject to any conditions the Governor requires," or to "remit any part of a sentence of imprisonment subject to any conditions the Governor requires, without the remission operating as a full pardon."

The MPC has a role in the commutation of life sentences. *See* COMAR § 12.08.01.15 (1995). "The [Parole] Commission will recommend to the Governor a commutation of a life sentence where the case warrants special consideration or where the facts and circumstances of the crime justify special consideration, or both." *Id.* § 12.08.01.15.B.

### III.     Motion to Strike

As noted, amici submitted a memorandum in support of the Motion to Dismiss (ECF 34), along with three documents. ECF 34-1 to ECF 34-3.[14]  In their Motion to Strike, plaintiffs argue, *inter alia*, that the filings of amici improperly assert defenses not raised by the defendants themselves, including "*res judicata*, *collateral estoppel*, sovereign immunity and broad PLRA exhaustion requirements."  ECF 36-1 at 6; *see also id.* at 2 n. 1.

Decisions about whether and how to allow amicus participation in federal district court are left to the discretion of the trial judge.  *See Finkle v. Howard County, Md.,* 12 F.Supp.3d 780 (D. Md. 2014).  However, the Fourth Circuit has signaled that amici are typically not permitted to raise issues beyond those raised by the parties. *Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011). The Fourth Circuit explained, 580 F.3d at 216: "Put simply, our Court and our sister circuits have consistently been wary, even prohibitive, of addressing an issue raised solely by an amicus."

In the exercise of my discretion, I will deny the Motion to Strike.  However, I will not consider any arguments advanced by amici that were not raised by the parties themselves.

_____

[14] Amici had previously submitted the same documents with their Motion to Intervene. *See* ECF 9.

## IV.    Standard of Review and Conversion to Summary Judgment

Plaintiffs' federal claims are predicated on 42 U.S.C. § 1983, which provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see also, e.g.*, *Filarsky v. Delia*, ___U.S.___, 132 S. Ct. 1657, 1660 (2012). To state a claim under § 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States." *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky*, 132 S. Ct. at 1661*; Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Plaintiffs' state law claims are predicated on Article 25 of the Maryland Declaration of Rights.  The Court of Appeals of Maryland has "consistently construed [Articles 16, 24, and 25 of the Maryland Declaration of Rights] as being *in pari materia* with their Federal counterparts." *Evans v. State*, 396 Md. 256, 327, 914 A.2d 25, 67 (2006) (alteration added).

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56.[15]  Defendants submitted several exhibits, totaling over 80 pages in length, with their Motion.  These include declarations,

---

[15] Defendants also move to dismiss under Rule 12(b)(1).  However, they do not address Rule 12(b)(1) in their 65-page memorandum.  Because defendants have not pursued their Rule 12(b)(1) contention, I decline to address it.

evidence regarding recently promulgated regulations, and information regarding the early release of five persons who received life sentences for offenses committed as juveniles.

A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Md.*, ___ Fed. Appx. ____, 2016 WL 6958439, at *2-3 (4th Cir. Nov. 29, 2016) (per curiam). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights...." *Id.* at 149. In general, courts are guided by whether consideration of

extraneous material "is likely to facilitate the disposition of the action[]" and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. Appx. 632, 638-640 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015).   However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp.

2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. Appx. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

Plaintiffs contend that conversion to summary judgment is inappropriate because they have not had an opportunity for discovery. ECF 35 at 35-38. In support of their contention, plaintiffs have submitted the Declaration of Barry J. Fleishman, Esquire, under Rule 56(d). *See* ECF 35-1 (Fleishman Declaration). Mr. Fleishman, who is co-counsel for plaintiffs, avers, in part, *id.* ¶ 6:

> 6. To oppose Defendants' Motion, Plaintiffs need to undertake discovery…regarding numerous topics, including, for example and without limitation:
>
> • The reasoning, intent, and administrative and regulatory history behind Defendants' new rules, regulations and procedures for juvenile offenders serving life sentences;
>
> • The implementation and impact of current and former classification systems for juvenile offenders serving life sentences upon their opportunities for release, as well as the availability of administrative remedies to address classification outcomes;
>
> • The scope of Defendants' reliance upon risk assessment tools to make determinations about opportunities for release, as well as other policies and practices of the Maryland Parole Commission;
>
> • The history of parole proceedings (including the number of individuals recommended for parole, set-offs and refusals) for juvenile offenders serving life sentences since at least 1995;
>
> • The history of clemency proceedings (including the number of individuals recommended by the MPC for commutation) for juvenile offenders serving life sentences since at least 1995;
>
> • The history of gubernatorial grants and denials of parole for juvenile offenders serving life sentences since at least 1995;
>
> • The facts and circumstances of the conditional commutations of John Alexander Jones, Mark Farley Grant, Mary Washington Brown, Karen Lynn Fried, and the medical parole of Milton Humphrey

Although it may not be necessary for plaintiffs to explore each of their proposed discovery topics, I agree that plaintiffs are entitled to conduct discovery relevant to their claims. A party "needs an 'adequate opportunity' to present its case and 'demonstrate a genuine issue of material fact.'" *Adams Housing, LLC*, 2016 WL 6958439, at *2.  As the Fourth Circuit stated in *McCray*, 741 F.3d at 483, "Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask."   And, I note that in cases raising similar claims, discovery has been conducted. *See, e.g.*, *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1004 (E.D.N.C. 2015) (determining, after discovery, that the procedures of the North Carolina Parole Commission failed to provide juvenile offender sentenced to life with parole a meaningful opportunity to obtain release that *Graham* requires), *appeal dismissed sub nom. Hayden v. Butler*, 15-7676, 2016 WL 4073275 (4th Cir. Aug. 1, 2016).

Moreover conversion to summary judgment is inappropriate because of the significant claims at issue, which have not been adequately considered.  In *Greiman v. Hodges*, 79 F. Supp. 3d 933, 946 (S.D. Iowa 2015), a § 1983 case brought pursuant to *Graham*, the court concluded that "discovery and full consideration of the case on the merits [was] warranted" because the plaintiff had "asserted important constitutional claims which present issues of first impression[.]" *See, e.g., Wershe v. Combs*, 763 F.3d 500, 505-06 (6th Cir. 2014), (vacating dismissal of Eighth Amendment claim in light of "novelty" of the claim); *McGary v. City of Portland,* 386 F.3d 1259, 1270 (9th Cir. 2004) ("'Court[s] should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" (quoting 5 Wright & Miller, § 1357, at 601–03); *Igartua–De La Rosa v. United States,* 417 F.3d 145, 192 (1st Cir. 2005) (same).

Accordingly, I decline to convert the Motion to one for summary judgment. Instead, I shall construe it as a motion to dismiss.

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint. *Goines v. Valley Cmty, Servs, Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, ___ U.S. ____, 133 S. Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, ___ U.S. ____, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 992 (2010). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th.Cir. 2011), *cert. denied*, ___ U.S. ____, 132 S. Ct. 1960 (2012).

In general, courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243. The

purpose of the rule is to ensure that defendants are "given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555–56 (2007). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Leichling, supra*, at \*2;*Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies ... if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

## V.     Relevant Precedent

In the past few decades, the Supreme Court has issued several decisions recognizing that "the Eighth Amendment dramatically limits the imposition of the harshest sentences on juvenile offenders." *Greiman*, *supra*, 79 F. Supp. 3d at 939.   A review of these decisions provides a framework for analysis of the issues in this case.

In *Thompson v. Oklahoma*, 487 U.S. 815 (1988), a plurality of the Court concluded that evolving standards of decency prohibit a death sentence for persons who were under the age of sixteen at the time of the offense.  In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court expanded its holding to individuals under age eighteen at the time of the offense.  In reaching its conclusion, the Court explained that juveniles differ from adults in three fundamental ways: (1) they possess a "lack of maturity and an underdeveloped sense of responsibility" that "often

result[s] in impetuous and ill-considered actions and decisions"; (2) they are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and (3) "the character of a juvenile is not as well formed as that of an adult." *Id.* at 569–71 (internal citations and quotation marks omitted).  According to the *Roper* Court, "[t]hese differences render suspect any conclusion that a juvenile falls among the worst offenders." *Id.* at 570.

Further, the *Roper* Court said, *id.* (internal quotations and citations omitted):

[I]t is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.

Then, in *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court considered a life sentence imposed on a juvenile in Florida for the offense of armed burglary.  Because Florida had abolished its parole system, a life sentence meant that the defendant had no possibility for release unless he was granted executive clemency.  *Id.* at 57.  The Court determined that "none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification" for a sentence of life without parole for a juvenile nonhomicide offender. *Id.* at 71; *see also id.* at 71-74.  The Court emphasized that a sentence of life without parole "alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence."  *Id.* at 69-70 (citing *Solem, supra*, 463 U.S. at 300-301).

The *Graham* Court concluded that the Eighth Amendment prohibits the imposition of a life sentence without parole for nonhomicide offenses committed by juvenile offenders. *Id.* at 74.

In articulating the constitutional requirements for juvenile offenders in such circumstances, the

Court said, 560 U.S. at 75 (emphasis added):

> A State is not required to guarantee eventual freedom to a juvenile
> offender convicted of a nonhomicide crime. *What the State must do, however, is
> give defendants like Graham some meaningful opportunity to obtain release
> based on demonstrated maturity and rehabilitation. It is for the State, in the first
> instance, to explore the means and mechanisms for compliance*. It bears emphasis,
> however, that while the Eighth Amendment forbids a State from imposing a life
> without parole sentence on a juvenile nonhomicide offender, it does not require
> the State to release that offender during his natural life. Those who commit truly
> horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving
> of incarceration for the duration of their lives. The Eighth Amendment does not
> foreclose the possibility that persons convicted of nonhomicide crimes committed
> before adulthood will remain behind bars for life. It does forbid States from
> making the judgment at the outset that those offenders never will be fit to reenter
> society.

The Court added, *id.* at 82:

> The Constitution prohibits the imposition of a life without parole sentence
> on a juvenile offender who did not commit homicide. A State need not guarantee
> the offender eventual release, but if it imposes a sentence of life it must provide
> him or her with some realistic opportunity to obtain release before the end of that
> term.

Two years later, the Supreme Court decided *Miller v. Alabama*, 567 U.S.___, 132 S. Ct.

2455 (2012), in which it held that, even in homicide cases, the Eighth Amendment forbids

subjecting a juvenile to a mandatory sentence of life imprisonment without parole.  *Id.*at 2469.

The Court explained, *id.* at 2467: "Such mandatory penalties, by their nature, preclude a

sentencer from taking account of an offender's age and the wealth of characteristics and

circumstances attendant to it."  Thus, a sentence of life without parole for a juvenile convicted of

homicide may be imposed only after the court has the opportunity to consider all the mitigating

circumstances, including the offender's age and age-related characteristics. *Id.* at 2475; *see also*

*id.* at 2469 (requiring the sentencer "to take into account how children are different, and how

those differences counsel against irrevocably sentencing them to a lifetime in prison.[]"). The

Supreme Court emphasized that, "given…children's diminished culpability and heightened capacity for change…appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," and reserved for "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 2469.

Most recently, in 2016, the Supreme Court determined in *Montgomery v. Louisiana*, ___U.S.___, 136 S. Ct. 718 (2016), that "*Miller* announced a substantive rule of Constitutional law," which applies retroactively. *Id.* at 734.  As the Supreme Court put it, that rule "bar[red] life without parole…for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility."  *Id.*  The Court reasoned, *id.* (citations omitted):

> *Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "'unfortunate yet transient immaturity.'" Because *Miller* determined that sentencing a child to life without parole is excessive for all but "'the rare juvenile offender whose crime reflects irreparable corruption,'" it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

Notably, the Court expressed concern that "*Miller's* conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Id.*at 736.  The Court concluded that juvenile offenders sentenced in violation of *Miller* "must be given the opportunity to show their crime did not reflect irreparable corruption; and if it did not, their hope for some years of life outside prison walls must be restored." *Id.* at 736–37.

Of import here, the Court expressly said, *id.* at 736: "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." The Court added, *id.*:

Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment…Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change.

## VI.    Discussion

### A.  Whether federal claims are properly brought under § 1983

Defendants assert that plaintiffs' federal claims (*i.e.*, counts one and three) are not cognizable under § 1983. ECF 23-1 at 17.  Relying on *Heck v. Humphrey*, 512 U.S. 477, 481, 487 (1994), defendants contend that an application for a writ of habeas corpus under 28 U.S.C. § 2254 is the exclusive remedy for state prisoners who challenge the fact or duration of their confinement and seek an immediate or speedier release from prison.

The Supreme Court has "held that a prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.' He must seek federal habeas corpus relief (or appropriate state relief) instead." *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (citations omitted) (explaining *Heck* and quoting *Preiser v. Rodriguez,* 411 U.S. 475, 489 (1973)); *see also Edwards v. Balisok*, 520 U.S. 641, 643 (1997) (noting that the *Heck* Court held that "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[.]'") (quoting *Heck,* 512 U.S. at 487). The *Heck* bar applies to a state prisoner's § 1983 action "no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 81–82 (emphasis in original).

In *Wilkinson*, 544 U.S. 74, two state prisoners challenged state parole procedures under §
1983, and the Court deemed the § 1983 claim cognizable. *Id.* at 82. The Court noted that the
prisoners were not seeking "an injunction ordering [their] immediate or speedier release into the
community." *Id.*   Rather, if successful, the prisoners would obtain quicker or new parole
hearings, and the parole board would have discretion whether or not to shorten the prisoners'
terms. *Id.*  "Because neither prisoner's claim would necessarily spell speedier release," the Court
concluded that § 1983 relief was available. *Id.*

Notably, in *Montgomery* the Supreme Court recognized that a violation of *Miller* could
be remedied without a resentencing. 136 S. Ct. at 736.  It said, *id.*:  "Giving *Miller* retroactive
effect…does not require States to relitigate sentences, let alone convictions, in every case where
a juvenile offender received mandatory life without parole."  Further, it added:  "A State may
remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for
parole . . . ." *Id.*

In Count One of the Complaint, plaintiffs do not attack their convictions or their
sentences.  Rather, pursuant to § 1983, they allege that Maryland's system of parole does not
provide them with a realistic and meaningful opportunity for release, in violation of the Eighth
Amendment.  ECF 1, ¶¶ 167-173.  Moreover, a court could conclude that Maryland's parole
scheme is unconstitutional without determining that plaintiffs' convictions or sentences are
invalid.  "Success in this [claim] does not necessarily mean that Plaintiffs will obtain a speedier
release from prison." *Hill v. Snyder*, No. 10-14568, 2011 WL 2788205, at *5 (E.D. Mich. July
15, 2011); *see also Wershe*, 763 F.3d at 504 (claims cognizable under § 1983 where prisoner
"does not seek direct release from prison or a shorter sentence; he seeks a change in the

procedures used to determine whether he is eligible for parole."). Accordingly, Count One is cognizable under § 1983.

In their third count, plaintiffs seek a declaratory judgment that C.L. § 2-201(b) is unconstitutional as applied to individuals who were juveniles at the time of their offenses, because it mandates life sentences in all cases of first-degree murder. ECF 1, ¶¶ 181-185.[16] The Named Plaintiffs, as well as many MRJI members, were sentenced pursuant to this statute. *Id.* ¶¶ 8, 65, 185. The claim is based on both federal and State law. *See id.* ¶ 185 ("Plaintiffs…have been injured by sentencing pursuant to Section 2-201(b)…in violation of the Eighth Amendment…and Article 25 of the Maryland Declaration of Rights.). Notably, the statute does not mandate a sentence of life without parole. Nor does it prohibit the suspension of any portion of the sentence. *See, e.g.*, *Cathcart v. State*, 397 Md. 320, 328, 916 A.2d 1008, 1013 (2007).

To the extent that Count 3 is based on federal law, defendants assert that the claim is not cognizable under § 1983. ECF 23-1 at 17. A declaration that C.S. § 2-201(b) is unconstitutional as applied to individuals who were juveniles at the time of their offenses "would necessarily imply the invalidity of [plaintiffs'] . . . sentence[s.]" *Heck*, 512 U.S. at 487. But, under *Heck*,

---

[16] C.L. § 2-201(b) states:

> (b)(1) A person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to:

> > (i) imprisonment for life without the possibility of parole; or

> > (ii) imprisonment for life.

> (2) Unless a sentence of imprisonment for life without the possibility of parole is imposed in compliance with § 2-203 of this subtitle and § 2-304 of this title, the sentence shall be imprisonment for life.

512 U.S. 477, a § 1983 action is not the proper vehicle for such a challenge.  Therefore, to the extent that Count 3 asserts a claim under federal law, it is not cognizable.

As to the State law claim in Count 3, defendants have not addressed the applicability of *Heck*.  Nevertheless, plaintiffs have failed to raise a plausible claim that C.L. § 2-201(b) violates Article 25 of the Maryland Declaration of Rights.

Plaintiffs have cited no authority for the proposition that a mandatory sentence of life imprisonment, with parole, for a Juvenile Offender is inherently unconstitutional under Article 25 or the Eighth Amendment.  Rather, as discussed, *infra*, a constitutional issue arises if, after the imposition of a life sentence, the Juvenile Offender is not provided with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

The Court of Appeals of Maryland has consistently construed Article 25 of the Maryland Declaration of Rights as being *in pari materia* with its federal counterpart.  *Evans*, 396 Md. at 327, 914 A.2d at 67.  Therefore, plaintiffs have failed to raise a plausible claim that C.L. § 2-201(b) violates the Maryland Declaration of Rights.

Accordingly, I shall dismiss Count 3 of the Complaint.

### B.  Statute of limitations

There is no federal statute of limitations for § 1983 claims.  *Lewis v. Richmond City Police Dep't.,* 947 F.2d 733, 735 (4th Cir. 1991).  Therefore, the applicable State limitations period applies. *Id*; *see Wilkins v. Montgomery,* 751 F.3d 214, 223 (4th Cir. 2014) ("There is no federal statute of limitations for § 1983 claims, so the state limitations period which governs personal injury actions is applied[.]") (Internal citation omitted); *see also Abeles v. Metro. Washington Airports Auth.*, __Fed. App'x__, 2017 WL 374741, at *6 (4th Cir. Jan. 26, 2017)

(unpublished) ("Because § 1983 does not contain an express statute of limitations, we use state statutes of limitations.") Under Maryland law, the general limitations period is three years. *See* Maryland Code (2013 Repl. Vol.), § 5–101 of the Courts and Judicial Proceedings Article.

In their Motion to Dismiss, defendants maintain that plaintiffs' claims are barred by the applicable three-year statute of limitations. Defendants contend that plaintiffs' claims accrued as early as 1995, when then-Governor Glendening announced that he "did not intend to grant parole to anyone serving a life sentence…" ECF 23-1 at 34. Plaintiffs counter, *inter alia*, that their claims are not time-barred, because they have satisfied the "continuing violation" exception to accrual. ECF 35 at 22.

A statute of limitations is ordinarily considered "an affirmative defense, meaning that the defendant generally bears the burden of affirmatively pleading its existence." *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir. 2006). As noted, a "motion to dismiss filed under Fed. R. Civ. P. 12(b)(6) ordinarily "cannot reach the merits of an affirmative defense." *Goodman*, 494 F.3d at 464. Rather, an affirmative defense can be resolved by way of a Rule 12(b)(6) motion only "in the relatively rare circumstances where . . . all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Id.* (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*).

In my view, it is not clear from the face of the Complaint that plaintiffs' claims are time-barred. ECF 1, ¶ 16. The Complaint does not specify whether members of MRJI were sentenced in the past three years to life imprisonment for crimes committed as juveniles. And, whether plaintiffs have demonstrated a continuing violation is a fact-specific inquiry that, in my view, is premature to address at this stage of litigation. *See generally Nat'l Advert. Co. v. City of Raleigh*,

947 F.2d 1158, 1167 (4th Cir. 1991).   Accordingly, the affirmative defense of limitations does

not provide a basis for dismissal.

## C.  Administrative Exhaustion

Defendants argue that plaintiffs' claims against the DOC are barred by the mandatory

exhaustion provision of the Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321-71,

as amended, 42 U.S.C. § 1997e(a).   ECF 23-1 at 64.   The PLRA provides, in pertinent part, 42

U.S.C. § 1997e:

> (a)  Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of
> this title, or any other Federal law, by a prisoner confined in any jail, prison, or
> other correctional facility until such administrative remedies as are available are
> exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or

detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent

for, violations of criminal law or the terms and conditions of parole, probation, pretrial release,

or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses all

prisoner suits about prison life, "whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed.

App'x. 253 (4th Cir. 2004).

Plaintiffs' claims include a challenge to the DOC's security classification directives.  As

discussed, plaintiffs claim that the automatic classification of all Juvenile Offenders to maximum

security upon commitment to DOC, and the categorical bar for lifers to progress below medium

security, denies Juvenile Offenders the opportunity to advance through the DOC system so as to demonstrate their maturity and rehabilitation.  ECF 1, ¶ 62.  Plaintiffs assert, *id.* ¶ 92:

> In the DOC, security classifications determine virtually all aspects of an individual's conditions of confinement. An individual's security classification determines in which institutions he or she may be housed, the level of restriction upon his or her freedom of movement, and all aspects of programmatic eligibility, including access to treatment, training, and employment.

DPSCS has made an "administrative remedy procedure" available to Maryland State prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against....official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a); *see generally* C.S. §§ 10-201 *et seq.*; COMAR 12.07.01.01(B)(1) (defining administrative remedy procedure, "ARP"). Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC]... against any officials or employees of the [DOC]...arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8).[17] An inmate "must exhaust" the ARP

---

[17] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).  Nor does the administrative grievance procedure apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007).

On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims.  These include claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; DCD 185-002 (effective August 27, 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).

Defendants cite *Watkins v. Sec'y, Dep't of Pub. Safety & Corr. Servs.*, 377 Md. 34, 831 A.2d 1079 (2003), for the proposition that security classifications are grievable.  In that case, inmates challenged whether revised DOC security classifications constituted *ex post facto* laws after the Inmate Grievance Office dismissed their grievances.  The Maryland Court of Appeals held that the new security directives did not violate *ex post facto* laws, because they were guidelines, not laws, properly promulgated by the Commissioner of DOC.  *Id.* at 45, 831 A.2d at 1086.  However, the Maryland Court of Appeals was not asked to consider whether a challenge to a security classification amounts to a "condition of confinement" and thus within the definition of a "grievance" subject to Maryland's administrative remedy procedure.

In any event, MRJI is clearly not a "prisoner" under the statute.  As MRJI is not a "person" and has neither been incarcerated nor detained, the exhaustion provisions of the PLRA do not apply to MRJI.

The Named Plaintiffs argue that defendants' "PLRA exhaustion argument is premature at the Motion to Dismiss stage."  ECF 35 at 39.  They also seek to demonstrate that "there is no available remedy to individual plaintiffs for grieving the classification decisions and practices challenged here. Plaintiffs believe that they would be able to discover evidence demonstrating that Defendants' own policies reflect that issues pertaining to classification cannot be grieved, as would Defendants' staff."  ECF 35 at 41. *See Ross v. Blake*, ___ U.S. ____, 136 S. Ct. 1850, 1855 (2016) (noting that a prisoner need only exhaust "available" remedies) (quoting 42 U.S.C.

§ 1997e(a)); *see also Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008) ("[A]n administrative remedy is not considered to have been available if a prisoner", through no fault of his own, was prevented from availing himself of it.")

Administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by a defendant. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.3d 674, 682 (4th Cir. 2005). In *Bock*, 549 U.S. 199, the Supreme Court made clear that "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id.* at 216.

As noted, a Rule 12(b)(6) motion tests the adequacy of a plaintiff's pleading. Typically, such a motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards*, 178 F.3d at 243 (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. To be sure, the *Jones* Court recognized that dismissal for failure to exhaust administrative remedies may be appropriate if the "allegations in the complaint suffice to establish that ground." 549 U.S. at 215. But, that will be the unusual case, because "the burden of pleading exhaustion in a case covered by the PLRA" is not placed "on the prisoner." *Id.* at 211; *accord Anderson*, 407 F.3d at 682 ("While it seems unlikely that the failure to exhaust administrative remedies will often be apparent from the face of a complaint, it is certainly possible that a complaint may clearly show that an inmate has not exhausted his administrative remedies.").

Here, defendants do not suggest that the allegations in the Complaint establish that plaintiffs have failed to exhaust their administrative remedies. To the contrary, defendants rely

on an exhibit to their Motion, the Declaration of Marci Jones, an Administrative Aide with the Inmate Grievance Office, who asserts that the Named Plaintiffs have not filed any grievances. *See* ECF 23-5.  But, in connection with a Rule 12(b)(6) motion, a court may only consider "matters outside the pleadings."  Therefore, I may not consider the Jones Declaration.

Dismissal is not appropriate here under Rule 12(b)(6) based on defendants' claim of failure to exhaust administrative remedies.

### D.  Failure to State a Claim

In sum, defendants' contention that the Complaint fails to state a claim upon which relief may be granted encompasses two issues:  1) whether, as a matter of law, the holdings of *Graham*, *Miller*, and *Montgomery* are limited to "criminal sentencings, rather than parole proceedings," and thus "do not apply to plaintiffs…" (ECF 23-1 at 47, 42), and 2) whether the allegations contained in the Complaint present a plausible claim that plaintiffs have been denied a meaningful opportunity for parole.  *Id.* at 51.

### 1.  Whether *Graham*, *Miller,* and *Montgomery* apply to parole proceedings

Defendants argue that, as a matter of law, the holdings of *Graham*, *Miller*, and *Montgomery* do not apply to plaintiffs, "none of [whom] received a sentence of life without the possibility of parole…" *Id.* at 49.  They maintain that *Montgomery*, *Miller*, and *Graham* "address the '*sentencer's* ability' to make the judgment in a homicide case that a defendant should never be eligible for parole…'" *Id.* at 46 (citation omitted) (emphasis in ECF 23-1).  But, they argue that these cases have no applicability beyond sentencings.  ECF 23-1 at 42.  In their view, the "limitation of the holding in these cases to criminal sentencings, rather than parole proceedings, is consistent with well-settled precedent that the granting or denying of parole is an executive decision, the merits of which are not subject to review by the Court." *Id.* at 47.

Plaintiffs counter that *Graham*, *Miller*, and *Montgomery* apply here, given their claim that, "rather than a system of parole, Defendants operate a system that functions in practice as a system of clemency which denies juvenile lifers a meaningful opportunity for release." ECF 35 at 27.

Several courts have rejected the argument that *Graham* has no applicability beyond sentencing. For example, in *Greiman*, 79 F. Supp. 3d 933, a juvenile nonhomicide offender was originally sentenced to life without parole but, after *Graham*, he was resentenced to life with parole. Thereafter, he brought a § 1983 suit, contending that the Iowa parole board "failed to provide him a 'meaningful opportunity for parole' when [it] summarily denied him parole based solely on the seriousness of his offense and failed entirely to 'take into account [Plaintiff's] youth and demonstrated maturity and rehabilitation as required under the new constitutional and statutory mandates.'" *Id.* at 936 (citation omitted) (last bracket in original).

The plaintiff also complained about the Iowa Department of Corrections "policy that requires him to take sex offender classes before he can be released on parole, but only permits inmates with less than two years before discharge to take such classes….Thus, since Plaintiff does not have a defined discharge date, he has been denied permission to enroll in sex offender classes, and in turn, cannot fulfill the necessary steps to obtain parole." *Id.* According to the plaintiff, the policy depriving him of sex offender treatment amounted to a *de facto* denial of his right to a meaningful opportunity for release. *Id.*

The defendants argued, as they do here, that "*Graham*…is inapplicable to 'release or parole considerations.'" *Id.* at 942 (citation omitted). The *Greiman* Court "disagree[d] with Defendants that *Graham* has no applicability outside the context of a juvenile's initial sentencing." *Id.* at 943. The court explained, *id.*: (emphasis and alterations in *Greiman*):

While Defendants are correct that the State has no obligation to guarantee Plaintiff release during his lifetime, *Graham* explicitly held that, "[w]hat the State *must* do...is give [juvenile nonhomicide offenders] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 130 S. Ct. 2011. It is axiomatic that a juvenile offender could only prove increased maturity and rehabilitation warranting release from custody at some time well after a sentence is imposed.

The *Greiman* Court recognized that, under the facts alleged, "the responsibility for ensuring that Plaintiff receives his constitutionally mandated 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' lies squarely with [the parole board]." 79 F. Supp. 3d at 943.   Further, the court determined that the plaintiff's allegations, assumed to be true, "state[d] a plausible § 1983 claim that Defendants, acting under color of state law, have wrongfully deprived and continue to deprive Plaintiff of a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' thereby violating his right to be free from cruel and unusual punishment under the Federal and State Constitutions." *Id.* at 944. The court pointed to allegations that the parole board's "'current policies ... fail to take into account...youth at the time of [the] offense and...demonstrated maturity and development.'"   *Id.* (citation omitted).

In addition, the court determined that plaintiff presented a plausible § 1983 claim based on allegations that the "policy on participating in sex offender treatment categorically excludes Plaintiff from participation because he does not have a defined discharge date", that sex offender treatment is required as a condition of parole eligibility, and that "Plaintiff is, in effect, denied not just of a meaningful opportunity for parole; he is denied *any* opportunity for parole."   *Id.* at 944 (emphasis in original). Notably, the court concluded, *id.*:   "Considering the current procedural posture…the Court agrees with Plaintiff that he has presented at least a plausible §

1983 claim that Defendants' policy…results in a *de facto* life without parole sentence that is prohibited by *Graham* and its progeny."

Similarly, in *Hayden*, 134 F. Supp. 3d 1000, a juvenile nonhomicide offender sentenced to life with parole brought a § 1983 action alleging that the North Carolina Parole Commission ("NCPC") failed to provide him with a meaningful opportunity for release. *Id.* at 1001. The court concluded that *Graham* applies to parole proceedings. *Id.* at 1009. Significantly, the *Hayden* Court explained, *id.*: "If a juvenile offender's life sentence, while ostensibly labeled as one 'with parole,' is the functional equivalent of a life sentence without parole, then the State has denied that offender the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' that the Eighth Amendment demands." The *Hayden* Court also suggested that *Miller*-type protections were required at parole proceedings. *Id.* (concluding that the NCPC "fail[ed] to consider 'children's diminished culpability and heightened capacity for change' in their parole reviews.[1]") (quoting *Miller*, 132 S. Ct. at 2469).

*Wershe*, 763 F.3d 500, is also informative. There, the prisoner was originally sentenced to life without parole for drug crimes committed as a juvenile. After the Michigan Supreme Court found that sentence unconstitutional, he was resentenced to a "paroleable" life sentence. *Id.* at 502. The prisoner subsequently brought a § 1983 action against members of the Michigan Parole Board, "alleging that the parole consideration process did not afford him a meaningful opportunity for release," in violation, *inter alia*, of the Eighth Amendment. *Id.* The Sixth Circuit "vacate[d] the portion of the district court's opinion dismissing Wershe's Eighth Amendment claim for failure to state a claim and remand[ed]…to the district court." *Id.* at 506. The court explained, *id.* at 505–06:

> Whether *Graham* applies to an individual in Wershe's position, and what constitutes a constitutionally meaningful and realistic opportunity for parole, are questions of first impression in this circuit.
>
> The district court rejected Wershe's Eighth Amendment claim with no mention of *Graham v. Florida,* analysis of whether *Graham* applies to Wershe, or consideration of whether Michigan parole proceedings provide a constitutionally meaningful opportunity for release….Given the novelty of Wershe's claim and the fact that the parties have not had an opportunity to present briefing, we think it best to permit the parties to further develop their arguments for consideration by the district court in the first instance.

On remand, the district court could not "say with certainty that *Graham* does not apply to Wershe merely because his sentence is technically one that gives him the possibility of parole." *Wershe v. Combs*, 1:12-CV-1375, 2016 WL 1253036, at *3 (W.D. Mich. Mar. 31, 2016). The court found "persuasive" the decisions from "district courts in other circuits [that] have held that *Graham*'s requirement that states offer juvenile offenders a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' extends to juveniles that are sentenced to life with the possibility of parole." *Id.* (citation omitted). The court explained, *id.*: "*Graham* imposed a categorical rule that prohibits states from deciding, at the time of sentencing, that a juvenile offender will necessarily spend the rest of his life in prison. The Court's discussion of a meaningful opportunity to obtain release, however, suggests that *the decision imposes some requirements after sentencing as well.*" (Emphasis added).[18]

Although the cases cited above were brought by prisoners convicted of nonhomicide offenses committed when they were juveniles, the reasoning is informative, in light of the promise in *Graham* and *Montgomery* that a meaningful opportunity for release extends to all juvenile offenders, except for those "whose crimes reflect permanent incorrigibility."

---

[18] Ultimately, the court determined that it did not need to decide "whether *Graham* imposes requirements on a parole board" because it determined that the state had provided Wershe with a meaningful opportunity to obtain release. *Wershe*, 1:12-CV-1375, 2016 WL 1253036, at *3.

*Montgomery*, 136 S. Ct. at 734.  It is difficult to reconcile the Supreme Court's insistence that juvenile offenders with life sentences must be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation", *Graham*, 560 U.S. at 75, if the precept does not apply to the parole proceedings that govern the opportunity for release.

Put another way, it is quite unlikely that the requisite "demonstrated maturity and rehabilitation" needed for release would be evident at sentencing.  To the contrary, such change would occur, if at all, after sentencing and during incarceration.  And, to the extent that such change occurs, the vehicle to recognize it would be parole.

Indeed, the *Montgomery* Court said, 136 S. Ct. at 736: "The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change."  Similarly, the Court said in *Graham*, 560 U.S. at 79, that the Eighth Amendment "does not permit" a state to deny a juvenile offender "the chance to *later demonstrate* that he is fit to *rejoin* society based solely on a nonhomicide crime that he committed while he was a child in the eyes of the law."  (Emphasis added); *see also Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 140 A.D.3d 34, 38, 30 N.Y.S.3d 397, 400 (N.Y. App. Div. 2016) (In a case challenging the denial of parole by a petitioner convicted of a homicide offense as a juvenile, stating: "A parole board is no more entitled to subject an offender to the penalty of life in prison in contravention" of the right to a meaningful opportunity to obtain release "than is a legislature or a sentencing court."); *Greiman*, 79 F. Supp. 3d at 943 ("It is axiomatic that a juvenile offender could only prove increased maturity and rehabilitation warranting release from custody at some time well after a sentence is imposed.")

A recent Fourth Circuit case, *LeBlanc v. Mathena*, 841 F.3d 256, 261 (4th Cir. 2016), although distinguishable, nonetheless provides strong support for the view that *Graham*, *Miller*,

and *Montgomery* apply to the allegations here.   In *LeBlanc*, a habeas case under 28 U.S.C. § 2254, the petitioner was sentenced to life imprisonment without parole for the nonhomicide offenses of rape and abduction, which he committed at the age of sixteen, nearly a decade before the Supreme Court decided *Graham*.  *Id.* at 259.   After *Graham*, the petitioner unsuccessfully sought postconviction relief in the Virginia state courts. Those courts concluded that Virginia's geriatric release program, which allows him to seek release beginning at the age of sixty, "provides the 'meaningful opportunity' for release that <u>Graham</u> requires." *Id.*   In a two-to-one decision, the Fourth Circuit disagreed.   It concluded that the petitioner was "entitled to relief from his unconstitutional sentence." *Id.* at 260.

Under Virginia's geriatric release program, an inmate who has reached age 60 must petition the Virginia Parole Board for geriatric release and provide "compelling reasons" for release. *Id.* During the "Initial Review" stage, the Virginia Parole Board has "unconstrained discretion" to "deny the petition . . . based on a majority vote." *Id.* at 262, 261. Virginia law does not specify what constitutes "compelling reasons," nor does it not "require the Parole Board to consider any particular factors in conducting the Initial Review" or "set forth any criteria" for review of a prisoner's petition, which may be rejected "for any reason." *Id.* at 261-262, 260.   "If the Parole Board does not deny a petition at the Initial Review stage, the petition moves forward to the 'Assessment Review' stage." *Id.* at 262.   At this stage, the Parole Board must consider certain "decision factors," which are enumerated in the Parole Board Policy Manual.  *Id.*

In analyzing the petitioner's Eighth Amendment claim, the Fourth Circuit articulated that *Graham* "established at least three minimum requirements for *parole or early release programs for juvenile nonhomicide offenders sentenced to life imprisonment…*" *Id.* at 266 (emphasis added); *see also id.* at 268 n. 6 ("[E]ven Respondents concede that <u>Graham</u> establishes minimum

requirements for parole or early release programs.") (Citation omitted).   The Court articulated

the three minimum requirements, *id.* at 266–67 (all but first alteration in *LeBlanc*):

> First, <u>Graham</u> held that such offenders must have the opportunity "to
> obtain release <u>based on demonstrated maturity and rehabilitation</u>." [Graham, 560
> U.S.] at 75, 130 S. Ct. 2011 (emphasis added). Put differently, the juvenile
> offender must have a "chance to later demonstrate that he is fit to rejoin society"
> and that "the bad acts he committed as a teenager are not representative of his true
> character." <u>Id.</u> at 79, 130 S. Ct. 2011. To that end, a parole or early release system
> does not comply with <u>Graham</u> if the system allows for the lifetime incarceration
> of a juvenile nonhomicide offender based solely on the heinousness or depravity
> of the offender's crime….
>
> Second, <u>Graham</u> held that the opportunity to obtain release must be
> "meaningful," which means that the opportunity must be "realistic" and more than
> a "remote possibility." <u>Id.</u> at 70, 75, 82, 130 S. Ct. 2011.  <u>Graham</u>'s "meaningful"
> requirement reflects the Supreme Court's long-standing characterization of
> "[p]arole [a]s a regular part of the rehabilitative process. Assuming good
> behavior, it is the normal expectation in the vast majority of cases." <u>Solem</u>, 463
> U.S. at 300–03, 103 S. Ct. 3001 (holding that, for purposes of the Eighth
> Amendment, executive clemency is not a substitute for parole because clemency
> is an "ad hoc" process that provides inmates with nothing more than a "bare
> possibility" of release). To that end, <u>Graham</u> held that the availability of executive
> clemency did not satisfy the "meaningful opportunity to obtain release"
> requirement. 560 U.S. at 69–70, 130 S. Ct. 2011.
>
> Third, <u>Graham</u> held that a state parole or early release program must
> account for the lesser culpability of juvenile offenders: "An offender's age is
> relevant to the Eighth Amendment, and criminal procedure laws that fail to take
> defendants' youthfulness into account at all would be flawed." <u>Id.</u> at 76, 130 S.Ct.
> 2011; <u>see also</u> <u>Miller v. Alabama</u>, __U.S.__, 132 S.Ct. 2455, 2465–66, 183
> L.Ed.2d 407 (2012) (explaining that <u>Graham</u>'s "foundational principle" is "that
> imposition of a State's most severe penalties on juvenile offenders cannot proceed
> as though they were not children").[] Accordingly, a state parole or early release
> system that subjects juvenile offenders to more severe punishments than their
> adult counterparts necessarily violates <u>Graham</u>.

In light of *Graham*, the Fourth Circuit sought to "determine whether the conclusion…that

Geriatric Release complies with <u>Graham</u>'s parole requirement was 'contrary to, or an

unreasonable application of' <u>Graham</u>.[]", 841 F.3d at 267.   The Fourth Circuit rejected the

conclusion of the Virginia courts that the geriatric release program satisfied the three minimum

requirements outlined earlier.  *Id.* at 259-260.  It explained, *id.* at 260 (emphasis and alteration

added and citation omitted):

> Most significantly, Virginia courts unreasonably ignored the plain language of the
> procedures governing review of petitions for geriatric release, which authorize the
> State Parole Board to deny geriatric release *for any reason*, without considering a
> juvenile offender's maturity and rehabilitation. *In light of the lack of governing
> standards*, it was objectively unreasonable for the state courts to conclude that
> geriatric release affords Petitioner with the "meaningful opportunity to obtain
> release based on demonstrated maturity and rehabilitation" [that] Graham
> demands.

Notably, the Court emphasized "the Parole Board's authority to deny Geriatric Release

for any reason—and without consideration of the 'decision factors'" at the initial review stage.

*Id.* at 268. And, of particular significance here, the Court concluded, *id.* at 269:  "It was

objectively unreasonable to conclude that Geriatric Release satisfied Graham's requirement that

juvenile offenders be able to obtain release 'based on maturity and rehabilitation,' when, under

the plain and unambiguous language of the governing procedures, the Parole Board can deny

every juvenile offender Geriatric Release for any reason whatsoever.[]"

Further, the *LeBlanc* Court said, 841 F.3d at 271 (citations omitted):

> Geriatric Release also fails to satisfy the "meaningful" opportunity requirement
> because there are no standards governing the denial of Geriatric Release
> petitions…[M]echanisms that allow a decision-maker to grant or deny early
> release "for any reason without reference to any standards," offer inmates nothing
> more than a "bare possibility" of release and therefore do not constitute "parole"
> for purposes of the Eighth Amendment.[]

According to the Fourth Circuit, it was "objectively unreasonable…to take the position

that a penal regime under which it concedes early release is the exception, rather than the

expectation, complies with Graham's meaningfulness requirement.  *Id.* at 271.  The Court said,

*id.* "[U]nder clearly established Supreme Court precedent—precedent repeatedly relied on by

Graham, *id.* at 70, 130 S. Ct. 2011—"parole" should be the "normal expectation in the vast

majority of cases" (quoting *Solem*, 463 U.S. at 300–03).   The Court also observed:  "For purposes of <u>Graham</u>, the key issue is not whether the Parole Board is 'able' to consider a juvenile offender's rehabilitation and maturity—it is whether the Parole Board <u>must</u> consider rehabilitation and maturation."  841 F.3d at 271 n. 10.

To be sure, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 (1979); *cf. Hawkins v. Freeman*, 195 F.3d 732, 747 (4th Cir. 1999) (indicating that there is no fundamental right to parole release).  And in *Graham*, 560 U.S. at 75, the Supreme Court cautioned that a "State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime."  However, plaintiffs "seek the opportunity to be judged under a constitutional parole scheme that gives them a 'meaningful opportunity to obtain release' as required under *Montgomery* and *Miller*…"  ECF 35 at 14-15.

The Fourth Circuit's reasoning in *LeBlanc* suggests that *Graham* and its progeny are not inapplicable as a matter of law, as defendants contend.  It would make little sense for the Fourth Circuit to have determined that *Graham* imposes several minimum procedural requirements for parole programs if, and only if, the prisoner was sentenced to life without parole, but not when a prisoner is sentenced to life with parole under a system that allegedly does not afford meaningful opportunities for release.  The logic of *LeBlanc* indicates that, in the absence of "permanent incorrigibility," the rationale of *Graham*, *Miller*, and *Montgomery* applies to a Juvenile Offender sentenced to life with parole for a homicide offense.  *Montgomery*, 136 S. Ct. at 734.

**2.      Whether plaintiffs have plausibly alleged a denial of a meaningful opportunity for release**

Defendants argue that even if *Graham*, *Miller*, and *Montgomery* are applicable, plaintiffs have not plausibly alleged that they have been denied a meaningful opportunity for release.

They assert: "[T]he plaintiffs have received consideration for parole, and that is all the Supreme Court decisions require."  ECF 23-1 at 49.  Defendants emphasize that the Eighth Amendment "does not *require* the State to release that offender during his natural life."  *Id.* (citations and quotation marks omitted, emphasis in ECF 23-1).

Defendants also argue that the Named Plaintiffs "have had, and continue to have, meaningful and realistic opportunities to obtain release."  ECF 23-1 at 52; *see generally id.* at 52-60.  They note: "Each has repeatedly been considered for parole – and in the case of Mr. McNeill, even recommended for release."  *Id.* at 12.  In addition, defendants maintain that consideration for parole, rather than parole itself, is what should be "the normal expectation in the vast majority of cases."  *Solem*, 463 U.S. at 300.

Plaintiffs counter that they have stated a claim that they have been denied a constitutionally adequate, meaningful, and realistic opportunity for release.  They assert, ECF 35 at 31 (citations omitted):

> Defendants claim that despite being in a system in which no juvenile lifer was paroled over the last two decades, and only 24 lifers, adult or juvenile, out of 2,000 have even been recommended for parole at all, the individual Plaintiffs "have had, and continue to have, meaningful and realistic opportunities to obtain release." Defendants seem to suggest that, because individual Plaintiffs have made heroic attempts to turn their lives around within a broken system and because they have had parole hearings, Defendants' policies and practices provide them a meaningful opportunity for release. That is absurd.

For example, plaintiffs assert, *id.* at 33 (emphasis in original): "*[F]or nearly 20 years*, Mr. McNeill has been identified in the DOC as a strong candidate for progression to lesser security but has been denied this opportunity solely because of his status as a lifer and without regard for his youth at the time of offense."  *See also id.* at 34 (asserting that the complaint "chronicl[es] repeated refusals of parole to Mr. Foster, despite his near-perfect institutional

record, either without any reason offered or else based on the nature and circumstances of the crime.[1]") (Internal quotation marks omitted).

"Case law and legal commentators both encourage the denial of Rule 12(b)(6) motions where novel or unique theories are presented." *Greiman*, 79 F. Supp. 3d at 945–46; *see id.* at 946  (concluding that "discovery and full consideration of the case on the merits is warranted" because plaintiff "has asserted important constitutional claims which present issues of first impression[.]").  *See, e.g., Wershe*, *supra*, 763 F.3d at 505-06 (vacating dismissal of Eighth Amendment claim in light of "novelty" of the claim); *McGary v. City of Portland,* 386 F.3d 1259, 1270 (9th Cir. 2004) ("'Court[s] should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" (quoting 5 Wright & Miller, § 1357, at 601–03); *Igartua–De La Rosa v. United States,* 417 F.3d 145, 192 (1st Cir. 2005) (same).  The claims presented in this case are novel, "particularly given the recency of *Graham*" and "the correspondent lack of case law analyzing its scope and applicability." *Greiman*, 79 F. Supp. 3d at 946.

As noted, in *LeBlanc*, 841 F.3d 256, the Virginia courts concluded that the State's geriatric release program, with a two-stage review process for geriatric release, provided the petitioner with a meaningful opportunity for release. *Id.* at 261.  As discussed, the Fourth Circuit recognized that *Graham* established at least three minimum requirements for parole or early release programs for juvenile nonhomicide offenders sentenced to life imprisonment, including: "(1) that juvenile nonhomicide offenders sentenced to life imprisonment must have the 'opportunity to obtain release based on demonstrated maturity and rehabilitation,' (2) that this opportunity must be 'meaningful,' and (3) that the early release or parole system must take into

account the lesser culpability of juvenile offenders…" 841 F.3d at 267.   The Fourth Circuit concluded that, as to juvenile offenders serving sentences of life without parole, the geriatric release program did not satisfy *Graham* because the parole board could deny release "for *any* reason whatsoever.[l]" *Id.* at 269.

As outlined earlier, Maryland law currently requires the Governor's approval of a MPC recommendation to grant parole to an inmate who has served fewer than twenty-five years of a life sentence, without application of diminution credits.   C.S. § 7-301(d)(4).   And, even if the MPC approves parole for an inmate who has served twenty-five years or more of a life sentence, the law allows the Governor to reject the MPC's parole recommendation. C.S. § 7-301(d)(5). Notably, under the unambiguous text of Maryland law, Maryland's Governor possesses unfettered discretion to deny every parole recommendation for *any* reason whatsoever or for no reason at all.

Indeed, the Maryland Court of Appeals has said: "The statutory provision applicable to the Governor's approval, § 7-301(d)(4) of the Correctional Services Article, contains no factors or guidelines for the Governor's exercise of discretion. Accordingly, the Governor is free to employ whatever guidelines he desires in exercising his discretion, except for guidelines that are constitutionally impermissible." *Lomax*, 356 Md. at 578 n. 2, 741 A.2d at 481 n. 2.   Similarly, C.S. § 7-301(d)(5) contains no factors or guidelines for the Governor's exercise of discretion.

The absence of any standards governing the Governor's exercise of discretion flies in the face of *LeBlanc*.   There, the Fourth Circuit determined that the Virginia geriatric release program was unconstitutional under *Graham* because, among other reasons, there was a "lack of governing standards…", which gave the parole board the authority to deny release "for any reason…" *LeBlanc*, 841 F.3d at 260.   A parole procedure does "little in the way of actually

making parole a possibility" when "the decision of whether to commute a sentence is entirely up to [the governor's] discretion and the political tides of the day." *Funchess v. Prince*, CV 14-2105, 2016 WL 756530, at *5 (E.D. La. Feb. 25, 2016).  And, a system of executive clemency, which lacks governing standards, does not constitute a meaningful opportunity to obtain release for Juvenile Offenders.  *See Solem*, 463 U.S. at 301 (explaining the difference between parole and commutation, which "is an *ad hoc* exercise of executive clemency. A Governor may commute a sentence at any time for any reason without reference to any standards.").

Arguing that "Maryland's early release system bears virtually no resemblance to the Geriatric Release program deemed unconstitutional in *LeBlanc*,[1]" defendants point to recently adopted regulations that require the MPC to consider the factors in COMAR 12.08.01.18.A(3), in conjunction with a parole hearing for a prisoner who committed a crime as a juvenile.  ECF 50 at 3.  However, these regulations do not address the role of the Governor, nor do they affect the statute that confers on the Governor unfettered discretion to approve or deny a parole recommendation, for any reason or no reason, without a single standard to guide the decision.

Plaintiffs allege that early release is the exception: "[B]etween 1995 and 2014, the 'MPC recommended [only] 24 lifers, both juveniles and adults, for parole. Every recommendation was rejected without any explanation to the individual denied parole.'"  ECF 35 at 32 (citation omitted); *see Solem*, 463 U.S. at 300 (instructing that parole should be "the normal expectation in the vast majority of cases").  Plaintiffs also allege that they have been denied parole due to the nature of their offenses or their status as lifers and that Juvenile Offenders are treated worse by the Maryland parole system due to the MPC's risk assessment tools. ECF 1, ¶¶ 61, 87.

I agree that "[i]t is not for this Court to determine whether the Parole's Board's procedures reflect best practices, or whether the Parole Board could institute procedures that provide

juvenile offenders with better opportunities to obtain release." *Wershe*, 1:12-CV-1375, 2016 WL 1253036, at *4. However, "the Supreme Court's proper regard for States' independent judgment regarding how best to operate their penal systems does not, '[e]ven in the context of federal habeas,...imply abandonment or abdication of judicial review.'" *LeBlanc*, 841 F. 3d at 274 (citation omitted and alteration in *LeBlanc*).

In the posture of this case, I must assume the truth of plaintiffs' allegations.  They state a plausible claim that Maryland's system of parole has deprived them of the right to a meaningful opportunity for release, in contravention of the Eighth Amendment and Article 25 of the Maryland Declaration of Rights.  *See, e.g.*, *Greiman*, 79 F. Supp. 3d at 943 ("The Court cannot conclude as a matter of law at this early stage of the proceedings that the [parole board's] parole review procedures either are or are not compliant with the constitutional mandate of *Graham*…"); *Hill*, *supra*, No. 10-14568, 2011 WL 2788205, at *6  ("Graham and Roper do not compel the conclusion that Plaintiffs' Eighth Amendment claims must fail as a matter of law, particularly at this early stage of the proceedings…The full Eighth Amendment analysis required by *Graham* involves the presentation of evidence that is not yet before the court on this Rule 12(b)(6) motion."); *Cf. Wershe*, 763 F.3d at 506 (vacating district court's dismissal of Eighth Amendment claim, "[g]iven the novelty of Wershe's claim and the fact that the parties have not had an opportunity to present briefing…").

## VII.   Conclusion

At this stage of the proceedings, plaintiffs have sufficiently alleged that Maryland's parole system operates as a system of executive clemency, in which opportunities for release are "remote," rather than a true parole scheme in which opportunities for release are "meaningful" and "realistic," as required by *Graham*.

- 48 -

For the reasons stated above, I shall GRANT in part and DENY in part the Motion to

Dismiss (ECF 23).  And, I shall DENY the Motion to Strike (ECF 36).

An Order follows.


Date: February 3, 2017                              _____/s/_____
                                                   Ellen Lipton Hollander
                                                   United States District Judge